STATE OF CONNECTICUT *v.*
JESUS ALBERTO CORREA
(SC 14956)

Callahan, C. J., and Berdon, Norcott, McDonald and Peters, Js.

Argued December 6, 1996—officially released June 10, 1997

*Susan M. Hankins*, assistant public defender, with whom, on the brief, was *John M. Barton*, assistant public defender, for the appellant (defendant).

*Michael E. O'Hare*, deputy assistant state's attorney, with whom was *John M. Massameno*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Jesus Correa, was charged in an eleven count information with crimes committed during the November 15, 1990 murder and robbery of two men on Adelaide Street in Hartford and with the crime of attempted escape from the Hartford community correctional center. The defendant was convicted, after a jury trial, of all counts.[1] Following a capital penalty hearing in which the jury found a mitigating factor, the defendant was sentenced to life imprisonment without the possibility of release, to run concurrently with additional sentences totaling seventy years. The defendant appeals from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).

The defendant claims that the trial court improperly: (1) admitted into evidence his statements to police because the statements were involuntary and given without a knowing, voluntary and intelligent waiver of

[1] The defendant was convicted of one count each of conspiracy to commit capital felony in violation of General Statutes §§ 53a-48 and 53a-54b (8), conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, capital felony in violation of General Statutes § 53a-54b (8), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48, 53a-133 and 53a-134 (a) (1) (2), robbery in the first degree in violation of General Statutes §§ 53a-133 and 53a-134 (a) (1) (2), possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), and attempt to escape in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-169 (a) (1), and of two counts each of murder in violation of General Statutes § 53a-54a (a), and felony murder in violation of General Statutes § 53a-54c.

his *Miranda*[2] rights; (2) gave the jury a supplemental instruction that he could be convicted as an accessory; (3) violated his state constitutional right to due process by rendering a judgment of conviction of capital felony even though the jurors did not unanimously agree on either accessorial or principal liability; (4) refused to grant his motion for a mistrial after the state introduced inadmissible evidence; and (5) admitted expert testimony that invaded the province of the jury and was more prejudicial than probative. The defendant also claims that a new trial should be granted because the state's attorney, in closing arguments, violated his constitutional rights by appealing to ethnic prejudice and commenting on his refusal to testify. The defendant also requests that we inspect documents sealed by the trial court to determine whether they should have been disclosed pursuant to the *Brady*[3] doctrine. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Rodolfo Garcia Tamayo was a Hartford drug dealer. Jorge Trujillo Izquierdo, a native of Colombia, South America, supplied Garcia with cocaine from New York. On November 14, 1990, Garcia met with the defendant and Yo-Yo, another drug dealer. Yo-Yo, whose identity remains unknown, was a Colombian who formerly had been a steady customer of Trujillo. Garcia and Trujillo agreed that on the following day, November 15, 1990, they would sell the defendant and Yo-Yo one kilogram of cocaine for $20,000.

Between 7:30 and 8 p.m. on November 15, 1990, the defendant borrowed a tan Cadillac El Dorado from Felix Rivera, who planned to sell the car to the defendant. The defendant had agreed to pay Rivera $1800 for the car, of which one half would be paid in cash and one

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

half in cocaine. When the defendant borrowed the car, he told Rivera that he needed it to go "get the stuff" in order to pay for the car.

The defendant and another person took the Cadillac to Adelaide Street, where Garcia and Trujillo were already waiting in Garcia's car. When the defendant approached Garcia's car, Garcia attempted to exit his car. The defendant shot Garcia in the shoulder and head, and Garcia fell back into the driver's seat. The defendant then shot Trujillo, who was in the passenger seat, at close range in the head. He then shot Garcia again in the head. Garcia and Trujillo died of those wounds. Thereafter, the defendant removed a metal box from the back seat of Garcia's car, ran to the Cadillac and jumped into its passenger side. The defendant and the driver then left the scene in the Cadillac.

After disposing of his gun, the defendant took the metal box to the apartment of his girlfriend, Elizabeth Delgado, arriving at about 9 p.m. The defendant had blood on his clothes. He told Delgado that "he had gotten into a fight . . . and he had to throw the gun away." Inside the box was a block of cocaine with a street value of $100,000. The defendant gave one or two ounces of the cocaine to Rivera in partial payment of the Cadillac. The defendant then put the empty box in the Cadillac and hid the remaining cocaine in his apartment at 54 Barker Street in Hartford.

Five days later, on November 20, 1990, the defendant was stopped in the Cadillac and arrested. During the early morning hours of November 21, 1990, the Hartford police executed a search warrant at the defendant's apartment. In the broiler pan storage area of the defendant's oven, they found a bag containing 839.7 grams of cocaine. At the defendant's apartment, the police also seized a shirt that later tested positive for gunshot residue on the left sleeve. Tests on the Cadillac showed

similar residue on the steering wheel and the passenger door. The police found a metal box in the Cadillac and opened it with a key from Garcia's key ring.

The jury could have found that the defendant's crimes were motivated by the fact that he did not have $20,000 to pay Garcia and Trujillo for the cocaine and that he went to the meeting armed and intending to murder them and leave with the cocaine. The jury, therefore, could have, and did, find the crimes to be robbery murders.

On December 6, 1991, it was discovered that the defendant had cut the top and bottom portions of a bar in his cell window at the Hartford community correctional center. The defendant had used tape to hold the bar in place and to conceal what he had done. A hacksaw, pliers, screwdriver, and a roll of tape were found in the defendant's cell. The defendant had also broken part of the louver window outside of the cell bars.

I

The defendant claims that the trial court improperly admitted into evidence three statements that he had given to the Hartford police. He argues that the statements were involuntary and given only as a result of threats, coercion and inducements made by the police. The defendant also claims that he made the statements without a knowing, intelligent and voluntary waiver of his *Miranda* rights. We find no merit to the defendant's claims.

"[T]he use of an involuntary confession in a criminal trial is a denial of due process of law. *Mincey* v. *Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Jackson* v. *Denno*, 378 U.S. 368, 376, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Culombe* v. *Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961); *State* v. *Shifflett*, 199 Conn. 718, 727, 508 A.2d 748 (1986).

*State* v. *Schroff*, 206 Conn. 182, 195, 536 A.2d 952 (1988). Furthermore, a criminal defendant is entitled, as a matter of due process, to a reliable, clear-cut determination prior to trial that the confession sought to be introduced by the state was made voluntarily. *Jackson* v. *Denno*, supra, 391. In Connecticut, the preliminary voluntariness determination is made by the trial court. See *State* v. *Oliver*, 160 Conn. 85, 95, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971).

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . *State* v. *Chung*, [202 Conn. 39, 53, 519 A.2d 1175 (1987)]. The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it; id., 53–54; including both the characteristics of the accused and the details of the interrogation. . . . *State* v. *Madera*, 210 Conn. 22, 41, 554 A.2d 263 (1989). Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Id.; see also *State* v. *Shifflett*, supra, 199 Conn. 728. Under the federal constitution . . . coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . . *Colorado* v. *Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

"The trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be over-

turned unless they are clearly erroneous. . . . *State* v. *Atkinson*, [235 Conn. 748, 759, 679 A.2d 920 (1996)]. On the ultimate issue of voluntariness, however, we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence. . . . *State* v. *Chung*, supra, 202 Conn. 54 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 410–12, 678 A.2d 1338 (1996).

The following evidence concerning the defendant's statements was introduced. On November 20, 1990, at approximately 8 p.m., Officer Ramon Bermudez of the Hartford police department stopped a tan Cadillac El Dorado occupied by persons identified as suspects in a homicide. Six or seven other police cruisers arrived and several officers, including Bermudez, approached the Cadillac with their service revolvers drawn.

Officer Charles Allen ordered the defendant out of the Cadillac, which he was driving. Bermudez handcuffed the defendant and placed the defendant in his cruiser.[4] Rivera, the other occupant of the Cadillac, was removed from the passenger seat. Bermudez asked the defendant his name, address and birth date. The defendant stated that he was Jose Alberto Nieves, born December 16, 1961, and that he lived at 42 Wilson Street in Hartford. An identification card found on the defendant's person, however, provided the name Jose A. Colon of 46 Wilson Street, Hartford, born January 17, 1967, and was signed "Jose Nieves."

Bermudez transported the defendant to Hartford police headquarters at about 9 p.m. Rivera was also taken there in another cruiser. Both individuals were seated in a large room, several feet apart. About five minutes later, the police began to question the defend-

---

[4] When apprehended the defendant was not under the influence of drugs or alcohol and did not appear nervous or surprised by the stop.

ant. Because the defendant claimed not to understand English, Bermudez, who spoke Spanish, served as an interpreter. Detectives Stephen Kumnick and Fred Morhardt conducted the interview. Bermudez read the defendant his *Miranda* rights, once in English and twice in Spanish. After Bermudez read each right, the defendant indicated that he understood. Bermudez then reviewed a waiver of rights form with the defendant, who signed the form and indicated that he wanted to waive his rights.

When asked if he knew why he had been apprehended, the defendant said that he did not know. When told that he was a suspect in a double homicide, the defendant said that he had not killed anyone. Bermudez then asked the defendant to identify his nationality. Initially, the defendant claimed to be from Rio Pedras, Puerto Rico. When Bermudez, who knew the area, asked the defendant about Rio Pedras, the defendant admitted that he was not Puerto Rican, but rather, Colombian, and that he had entered the United States illegally about one and one-half years earlier. The defendant also stated that his family was residing illegally in the United States. The police then told the defendant that if he would tell them what had happened, they would see what they could do for his family with the Department of Immigration and Naturalization Services. The defendant shrugged his shoulders and did not respond.

Fifteen to twenty minutes into the interview, the defendant was informed that he was lucky that the police had picked him up. The defendant was told that the police had information that two people were being paid $50,000 to kill him because he had killed someone very important in the New York drug business. The defendant was also told that the hired killers might go after his family if they could not reach him. The defend-

ant remained calm and continued to deny any knowledge of the murders.

In the interview, the defendant was questioned about the Cadillac and his whereabouts on November 15, 1990. The defendant said that he had bought the Cadillac from Rivera on the night of November 15. He stated that he paid for the car with money he had earned working as a janitor at the federal building in Hartford. The defendant also stated that he usually worked from 12 to 9 p.m. and had worked the night of the murders. When confronted with the contradiction of having both worked and purchased the car on the same night, the defendant explained that his car was parked on Hungerford Street between 7 and 9:30 p.m. that night. The police told the defendant that he was one of the "most confused persons" ever and that someone had seen his car leaving the crime scene. The defendant continued to remain calm and to maintain that he had not killed anyone. During the interview, the defendant also stated that he had a beeper.

The detectives also showed the defendant two photographs, which they identified as the men whom he had killed. The photographs had been taken prior to the victims' deaths. Only then did the defendant appear to become nervous and agitated. The defendant would not look at the photographs despite the requests of the detectives and continued to assert that he knew nothing. The interview ended after forty-five minutes to one hour. Thereafter, the defendant was moved to an interview room at about 10 p.m.

At approximately 3:10 a.m. on November 21, 1990, Officer Ezequiel Laureano, who had been assigned to transport the defendant to the booking area and who spoke Spanish, entered the interview room where the defendant was being held and handcuffed him. There is no evidence of any attempt by the police to interview

the defendant between the end of the first interview and this time. As the defendant and Laureano were leaving the room, the defendant whispered in Spanish that he wanted to speak with Laureano in private. Laureano discussed the defendant's request with Sergeant Lawrence Irvine, who instructed Laureano to inquire about what the defendant wanted. When asked, the defendant stated that he did not commit the murders, but that he knew who did. Laureano then read the defendant his rights again in both English and Spanish. The defendant stated that he understood his rights and that he would waive them. Laureano then served as an interpreter while the defendant gave a statement to Irvine.

The defendant told the officers that, at 6:30 p.m. on November 15, 1990, he was in front of 179 Hungerford Street when he was approached by a man he knew as Luis Carlos. This man asked the defendant if he could borrow the defendant's car to take his girlfriend home, and the defendant agreed. The defendant had become very upset because Carlos did not return with the car until sometime between 9 and 10 p.m. When Carlos finally returned, the defendant had a heated argument[5] with him before returning to Delgado's house. The defendant stated that he remained at Delgado's house until about 10:10 p.m., when Delgado's brother-in-law drove him to his apartment because the Cadillac would not start.

Between 6:20 and 8:10 a.m. on the morning of November 21, 1990, Detective Louisa St. Pierre, who spoke Spanish, took a written statement from the defendant. St. Pierre discussed with the defendant his *Miranda* rights. In response, he stated that he had been given

---

[5] Laureano testified that the defendant described the dispute as a verbal altercation only and that the defendant made no mention of a physical altercation.

his rights, that he understood them, and that he wished to give a statement. The defendant did not appear to be tired, agitated, nervous or upset.

St. Pierre then asked the defendant questions to which he gave responses that St. Pierre typed in Spanish. During this interview, the defendant was shown the shirt he had worn the night of the murders. This shirt had been seized by the police during a search of the defendant's home that morning. When the two page statement was completed, the defendant read it. St. Pierre explained to the defendant the English portions of the form on which the statement was typed.[6] The defendant then signed the document under an oath administered by St. Pierre in Spanish.

In the statement, the defendant claimed that Carlos had borrowed the Cadillac from him on the night of the murders, that Carlos had returned late, and that they had had a fight during which the defendant got blood on his pants. The defendant further claimed that he had discovered the cocaine in his car only after returning to Delgado's house.[7]

[6] These portions provided: "I, Jesus Correa, of 54 Barker Street in Hartford was born on [D]ecember 16, 1961, in Cali, Colombia, South America. I attended five grades of school. I cannot read or write English. I've lived at my present address for five months. . . . This statement was given at 50 Jennings Road, Hartford, Connecticut. . . . I am giving the following statement of my own free will on well accord without fear, threat or promise."

[7] The defendant's statement reads: "I am in the police station in the city of Hartford, in the state of Connecticut giving this statement about what I know concerning a homicide that occurred on Thursday, November 15. This statement is being taken by Detective Louisa St. Pierre in Spanish because I do not read English.

"The detectives gave me my rights and I know that I do not have to say anything about my part in the homicide. But I decided to tell the truth about everything I can.

"The Thursday that the homicide occurred I went to work in the morning in Center Enterprises where I have worked for a year and a half. I worked all day and got out at 4:30 in the afternoon. After I got out of work I went to my house and I bathed and changed my clothes. Afterwards I went to my girlfriend's house [whose] name is Elizabeth Delgado and lives on the Street Hillside Avenue. I arrived at her house about six in the evening. Her

The trial court found that the defendant had made a voluntary, knowing and intelligent waiver of his rights.

husband was working. I was there a short time when a man that I know only as 'Tato' arrived with a car that he wanted to sell. The car was a Cadillac, 1980, the car was color beige and had the top coffee color.

"He wanted to sell the car for 1,800.00 dollars. I told him that I was going to buy it and I took the car. I went to Hungerford Street where I parked the car and I spoke with some friends. There were like four friends there. There was one named Pedro, Esteban, Jose also, there was the man whom I lent the car to and his name is Luis Carlos. He is a Puerto Rican. I do not know the last name of any of the men that were together with me when I parked the car.

"Luis Carlos told me that he found the car very pretty and told me to lend it to him to go for a spin. I let him take it and he returned very late. I thought that he was going to take it only to go for a spin. Luis Carlos returned late it was close to 8:30 . . . in the evening. When he arrived we had a discussion and fought. Fought using fists. Luis Carlos is a little taller and bigger than I.

"I hit him a few times once I hit him with the knee in the mouth. And took the chance of entering in the car and left. I went directly to the home of Elizabeth. I arrived at Elizabeth's home like after nine at night. When I arrived at Elizabeth's house I was bleeding. On the pants I had blood. I had a coffee color pants and a green shirt. The shirt was shown to me by the detective. He brought it to the police station. The shirt was in my sister's house.

"Elizabeth asked me what had happened. Because I had blood on the pants. I told her that I had gotten into a fight. I told her that I had a fight with a 'Boricua.' Afterwards I wanted to leave in the car but it would not start. I returned and told her to call me a taxi that I was going to my home. It was past 10 [p.m.] and Elizabeth's husband arrives like around twelve at night. Elizabeth called her sister-in-law and Elizabeth's brother took me home. I arrived home around eleven at night.

"When I arrived at Elizabeth's house I parked the car and when I was going to get out of the car I saw a box on the passenger side. I saw a small coffee color metallic box on the floor of the car. I opened the box and saw that it had a quantity of 'perico' inside. I took the perico out of the small box. I returned it an[d] put it in the small box and took it upstairs to Elizabeth's house. Elizabeth saw it and asked me what that was. I told her that it was some drugs that were in the car. When Elizabeth's brother came to take me home I had the perico in a bag. I had the cocaine in a paper bag when he took me home. When I arrived at my home I put away the cocaine . . . under the stove in my sister's home with whom I lived. . . .

"On Saturday there was a party at my house and I did not take out the car. On Sunday, I left about one in the afternoon. I went to a friend['s] house whom I asked to give me a ride.

"The box that had the cocaine is behind in the trunk of the car, I put it there."

It found that the defendant had been read his rights, understood them and signed multiple waiver of rights forms. The court also found that the defendant was about twenty-five years old and that, although he had only five years of formal education, he was able to communicate with the police in Spanish without any difficulty. The court further found that the defendant's physical condition appeared to be good at all times and that he did not appear to be under any stress. The court found as a fact that the defendant initiated the statement to Laureano and Irvine at 3:10 a.m. The court further concluded that the defendant's statements were not motivated by any promises or threats by the police. The court held, therefore, that the state had satisfied its burden of proof that the defendant had waived his rights and that his statements were made freely and voluntarily.

The defendant argues that the combination of the circumstances of his arrest, the intimidating attitude of the police, the offer concerning the immigration status of his family, the statements regarding the $50,000 contract against his life, and his alienage and lack of education render his statements involuntary.[8] We address these arguments with the recognition that the defendant

---

[8] The defendant also claims that "[t]he record here is severely hampered by the court's refusal to allow testimony on the specific questions [the] police asked the defendant during the interrogation and the defendant's response." The defendant argues, therefore, that he was denied a fair hearing on the issue of the voluntariness of his confession. The futility of this argument, however, is demonstrated by the specifics of the defendant's primary claim. After the trial court initially denied the defendant's motion to suppress, the state revealed that during the initial interview there had been discussions concerning the deportation status of the defendant's family and the contract on his life and that the police had attempted to show the defendant photographs of the victims. The motion to suppress was then opened, and Bermudez was recalled to testify regarding the specific questions the police had asked the defendant. The defendant then had every opportunity to explore the issue of voluntariness on cross-examination of Bermudez, or by calling his own witnesses, which he chose not to do.

has not claimed, and there is no evidence that, he suffered any physical coercion or was denied food or rest.

An involuntary confession may result from psychological, as well as physical, coercion. *Miller* v. *Fenton*, 796 F.2d 598, 602–603 (3d Cir. 1986). "However, while a per se involuntariness rule applies when an interrogation is accompanied by physical violence, see *Stein* v. *New York*, 346 U.S. 156, 182, 73 S. Ct. 1077, 1091, 97 L. Ed. 1522 (1953), no such rule applies when the alleged coercion is psychological. [Id., 184]. As the [United States] Supreme Court has noted, '[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused.' *Haynes* v. *Washington*, 373 U.S. 503, 515, 83 S. Ct. 1336, 1344, 10 L. Ed. 2d 513 (1963)." *Miller* v. *Fenton*, supra, 604.

We agree with the trial court that the defendant's will was not overborne by any promises, threats or coercion. The trial court aptly observed: "I don't see whether the court . . . could come to any conclusion that the confession . . . if this was a confession and I am not sure that it was a confession, a statement made by the defendant, was not freely and voluntarily made."

It is significant that the defendant never confessed to the murders and robbery in response to the police statements that he now claims to have been psychologically coercive. While the defendant stated during the initial interview that he owned the Cadillac El Dorado and had a beeper, we conclude that, under the circumstances, the defendant was never "coerced" into providing this information. The defendant had been apprehended while driving the Cadillac with Rivera,

who had sold him the car on the night of the murders, as a passenger. The defendant knew that Rivera also had been taken by the police for questioning that night and that Rivera could provide the police with certain incriminating information. He continually denied any knowledge of the murders while revealing the information that he knew Rivera could provide to the police.

Approximately five hours later, however, the defendant initiated a statement when Laureano came to take him to the booking room. The defendant does not claim that Laureano sought to question him or asked him to give a statement. Instead, the defendant sought to explain away his possession of the incriminating Cadillac. Later in the morning, while being shown the shirt that police had seized from his apartment, the defendant also tried to explain away the metal box containing cocaine that Rivera had seen in his possession on November 15, his bloody clothes and the kilogram of cocaine that the police would discover. All the while, he attempted to incriminate Carlos. If the defendant's will was overborne, it is highly unlikely that he would have signed a statement in which he accused another individual of being the killer. The defendant's consistent claims that he had not been involved in the crimes provide strong evidence that his will was not overborne by any police tactics. See *Self* v. *Collins*, 973 F.2d 1198, 1214 (5th Cir. 1992) ("[i]f [the defendant] had been coerced into saying whatever would please law enforcement officials, it seems most unlikely that they would have allowed him to sign a confession that was inconsistent with the physical evidence"); *McCall* v. *Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) ("it is noteworthy that [the defendant's] denials were consistently exculpatory and he persistently identified [another] as the individual who shot and killed [the victim]"); *United States* v. *Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) (defendant's

statement was not involuntary where he "refused to give certain information").

We do not find any evidence that the defendant's statements were procured by use of the police tactics of which the defendant complains. Other facts support our conclusion that the statements were not the product of police coercion. The defendant was transported to police headquarters, where he was seated in a large room, and in no way threatened with physical force. There, the police repeatedly read the defendant his *Miranda* rights before beginning the interrogation. "[A] warning at the time of the interrogation is indispensable to overcome its pressures and to [e]nsure that the individual knows he is free to exercise the privilege at that point in time." *Miranda* v. *Arizona*, 384 U.S. 436, 469, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see *State* v. *Lapointe*, 237 Conn. 694, 734, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

The defendant argues that the police statements regarding his family's immigration status and the purported contract on his life overcame his will. We disagree.[9] The defendant reacted calmly when these statements were made and exhibited no signs of duress. It was several hours later before the defendant himself initiated a statement seeking to exculpate himself and to inculpate Carlos. There is nothing in the record to show that the defendant was persuaded to give incriminatory statements to police as a result of the police

---

[9] The defendant also points to the fact that the police tried to show him photographs of the victims. The defendant reacted to this by rocking in his chair and breaking out in "like a cold sweat." We do not agree with the defendant, however, that this police action coerced him to give a confession. The photographs of the victims, which depicted them while alive, were not the type to overcome his free will. The defendant was calm and collected for the remainder of the interrogation, both before and after the police tried to show him the photographs. See *United States* v. *Major*, 912 F. Sup. 90, 96 (S.D.N.Y. 1996). Furthermore, despite the defendant's physical reaction to the photographs, he continued to deny involvement in the shootings.

representations. *State* v. *Lapointe*, supra, 237 Conn. 733 ("[w]ithout a causal connection, even the most egregious police misconduct will not render a confession involuntary under the due process clause"), and cases cited therein; *State* v. *James*, supra, 237 Conn. 428 ("the defendant did not confess because his will to remain silent was overborne, but rather . . . he confessed of his own free will because he believed it would be in his best interest to do so").

In sum, we agree with the trial court that the defendant's statements were the result of the police stopping the defendant in the Cadillac and informing him that someone saw the Cadillac leave the crime scene rather than of any of the other interrogation techniques employed by the police, which the defendant labels as coercive. The initial interview of the defendant, in which the circumstances the defendant complains of took place, lasted until about 10 p.m. The defendant was then taken to the interview room until 3:10 a.m. During that time, he was not interrogated. When Laureano then went to the interview room to take the defendant to be booked, the defendant *initiated*, as the trial court found, his statement attempting to incriminate Carlos. Later in the morning, after the defendant had been shown the shirt seized from his apartment, he added that he had fought with Carlos, leaving blood on his clothes, and that he had found the box of cocaine in his car. We conclude that the defendant's statements were voluntary and properly admitted against the defendant at his trial.

With respect to the waiver of his *Miranda* rights, the defendant argues that the same police conduct that coerced him into giving statements also establishes that his waiver was not knowing, intelligent and voluntary. As the evidence presented above demonstrates, however, the police repeatedly advised the defendant of his *Miranda* rights and ascertained that he understood

those rights. The defendant's statements, following these warnings, were initiated by him in the hope of explaining what he knew the police already knew or were about to discover from Rivera, other witnesses and the search of his apartment. We conclude, therefore, that "[t]he evidence that establishes the voluntariness of the defendant's statements equally establishes that his waiver of his *Miranda* rights was knowing, intelligent and voluntary." *State* v. *Roseboro*, 221 Conn. 430, 444, 604 A.2d 1286 (1992).

## II

The defendant claims that the trial court denied him his rights to due process and a fair trial[10] by giving the jury a supplemental instruction that allowed the jury to convict him as an accessory of one count each of capital felony and robbery in the first degree, and two counts of murder.[11] The defendant argues that the state prosecuted him only as a principal and that in preparing his defense he relied on not being charged as an accessory. We are unpersuaded. Because it is clear from the record that the defendant was on notice that he could face liability as an accessory, he suffered no prejudice from the trial court's supplemental instruction.

The fact that a defendant is not formally charged as an accessory pursuant to General Statutes § 53a-8 does not preclude a conviction as such. *State* v. *Crump*, 201 Conn. 489, 493, 518 A.2d 378 (1986). "This state . . . long ago adopted the rule that there is no practical significance in being labeled an 'accessory' or a 'principal' for the purpose of determining criminal responsibility." *State* v. *Harris*, 198 Conn. 158, 164, 502 A.2d 880

---

[10] The defendant cites the fifth, sixth and fourteenth amendments to the United States constitution and the constitution of Connecticut, article I, §§ 8, 9.

[11] The state argues that the defendant's claim pertains only to the capital felony count. We disagree.

(1985). Under the modern approach, "a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . .' " Id. " '[T]here is no such crime as "being an accessory" . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed.' *State* v. *Baker*, 195 Conn. 598, 608, 489 A.2d 1041 (1985)." Id., 163.

In *State* v. *Steve*, 208 Conn. 38, 45–46, 544 A.2d 1179 (1988), however, it was held that the defense was prejudiced as a result of a substantial variance between the allegations in the bill of particulars that the defendant was the principal and the court's instructions concerning accessorial liability where the state presented no evidence in its case-in-chief that the defendant had acted as an accomplice. "The purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense and avoid prejudicial surprise. *State* v. *Roque*, 190 Conn. 143, 154, 460 A.2d 26 (1983). A bill of particulars limits the state 'to proving that the defendant has committed the offense in substantially the manner described.' *State* v. *Ruiz*, 171 Conn. 264, 270, 368 A.2d 222 (1976)." *State* v. *Steve*, supra, 44–45.

The state argues that *Steve* is distinguishable because in this case the state alleged in the substitute information and bill of particulars that the defendant was guilty of two counts of felony murder because he, or another participant in the robbery, caused the deaths of the victims by shooting them with a handgun. The state also argues that the state's attorney provided the defendant with notice of the accessorial liability theory by stating, at the end of the state's case-in-chief, that he would request an instruction on accessorial liability if the defendant attempted to introduce evidence that the defendant was an accessory rather than the principal

or if the defendant made such an argument.[12] The defendant interprets the state's attorney's statement as an assertion that the state would not seek an accessory instruction absent those circumstances. The defendant claims that he relied on this assertion when presenting his defense. See footnote 16 of this opinion.

The trial court instructed the jury that in order to convict the defendant of capital felony and the two counts of murder, the jury must find beyond a reasonable doubt that *the defendant* committed the murders of the two victims. With respect to the two counts of felony murder, the court instructed the jury that it must find that the defendant, *or another participant*, caused the deaths of the victims while in the course of or in furtherance of the commission of robbery in the first degree. Finally, the court instructed the jury that in order to convict the defendant of robbery in the first degree, it must find that the defendant, *or another participant*, caused serious physical injury or was armed with a deadly weapon in the course of the commission of a crime or immediate flight therefrom.

After the court instructed the jury, the court excused the alternates immediately before lunch and did not return until after 3 p.m. At 2:20 p.m., the jury sent a note asking if it should begin deliberating and requesting pads of paper and a list of charges. At 3:25 p.m., the jury sent a second note asking the following question: "Count[s] six and seven [the two counts of felony murder], does the defendant have to be the person causing the murder in order to find him guilty or merely a participant in [the] robbery in which the victim

---

[12] The state's attorney specifically stated: "I just want to mention on the record that there is a case . . . on the issue of accessorial liability and I did want to apprise the court that the state does or may . . . at the time of the charge to the jury, ask the court and the state may rely . . . on the statute that allows somebody charged as a principal to also be found guilty as an accessory, regardless of whether the information so charges it."

was murdered? . . . nine [the count of first degree robbery] does the defendant have to be the person using force or causing injury or merely a participant in the incident?" At 3:57 p.m., the court instructed the jury not to deliberate until the court had answered the question concerning counts six and seven and excused the jury until the next morning. In response the next morning, the court instructed the jury on the law of accessorial liability and instructed the jury to apply that law to the count of capital felony, the two counts of murder, the two counts of felony murder and the count of robbery in the first degree. The court then answered the jury's question by stating that the defendant did not have to be the person who caused the murder for counts six and seven and did not have to be the actual perpetrator for count nine.[13] Thereafter, the court told the jury it was excused and could deliberate.

The defendant argues that the supplemental instruction on accessorial liability requires reversal of the judgment as to the capital felony count, the two counts of murder and the robbery count.[14] The defendant focuses on the jury vote for the capital felony count. After the verdict, on a motion by the defendant, the jury was asked whether the conviction of capital felony was based on a finding of principal or accessorial liability. The jury answered that ten jurors voted to convict the defendant as a principal and two voted to convict the defendant as an accessory.

We do not agree with the defendant that the jury's findings demonstrate prejudice where the substitute

[13] The jury also asked whether the defendant had to be the actual perpetrator for count eight, conspiracy to commit robbery in the first degree. The court told the jury that the defendant had to be an actual conspirator.

[14] The trial court initially instructed the jury, pursuant to the language of § 53a-134 (a) (1) and (2), that the defendant *or another participant* in the crime caused serious physical injury to any person or was armed with a deadly weapon. The defendant does not object to that initial instruction. Therefore, it can hardly be seen how the supplemental instruction prejudiced him with respect to the robbery count.

information and bill of particulars permitted a theory of accessorial liability and the evidence demonstrated that the defendant could have been an accessory.

We do not read each count specified in the substitute information and bill of particulars in isolation. See *State* v. *Beaulieu*, 164 Conn. 620, 626, 325 A.2d 263 (1973) (information supplied by another count). In this case, the defendant was charged with three counts of conspiracy,[15] each of which specified that "another person, who is believed to use the street name 'Yo-Yo,'" conspired with the defendant to commit murder. Also, the two counts of felony murder alleged that the defendant and Yo-Yo committed the crime of robbery in the first degree and that the defendant, or another participant, caused the deaths of the two victims. See *State* v. *Williams*, 220 Conn. 385, 389–90, 599 A.2d 1053 (1991). During the trial, an eyewitness testified that on the night of the murders she saw an individual, who did not look unlike the defendant, run from the victim's car to the defendant's Cadillac carrying a box and enter the passenger side door of the Cadillac as the car began to move off. The state's evidence, thus, demonstrated that the defendant was one of two persons responsible for these robbery murders. This case, therefore, is clearly distinguishable from *State* v. *Steve*, supra, 208 Conn. 46, in which this court found it "significant that the state presented no evidence in its case-in-chief suggesting that the defendant had acted as an accomplice."[16] We conclude that the defendant had notice that

---

[15] Count one alleged conspiracy to commit capital felony, count two alleged conspiracy to commit murder, and count eight alleged conspiracy to commit robbery in the first degree.

[16] The dissent argues that this case is more egregious than *State* v. *Steve*, supra, 208 Conn. 38, where a majority of this court found prejudice to the defendant. In *Steve*, the defendant claimed to have relied on the absence of an accessory charge when he took the witness stand and testified in his own defense that a second person had actually shot the victim and that he had not participated although he had been present. Id., 42. The majority of the court in *Steve* concluded that it was "probable that the defendant's

he was subject to accessorial liability and, therefore, the trial court did not improperly give the supplemental instruction.

## III

The defendant claims that his conviction of capital felony violates his state constitutional rights to due process, a fair trial and the prohibition against cruel and unusual punishment because the jury did not unanimously agree on whether the defendant was liable as a principal or an accessory for the shooting deaths of Garcia and Trujillo.[17] The jury was polled as to the basis of the defendant's conviction of capital felony. Ten jurors found him guilty as a principal and two as an accessory.

The defendant urges us here to find greater protection of his rights under the state constitution than under the federal constitution as interpreted by the United States

decision to testify [provided] the evidence that furnished a basis for finding him guilty as an accomplice . . . ." Id., 46. No such evidence was presented by the defendant here, and the defendant is unable to point to any instance when his defense was prejudiced.

[17] The defendant relies on the constitution of Connecticut, article first, §§ 8, 9 and 19.

Article first, § 8, provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

Article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

Article first, § 19, provides: "The right of trial by jury shall remain inviolate."

Supreme Court. We explore this claim by utilizing the criteria set forth in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992): (1) the text of our constitution; (2) decisions of this court and the Appellate Court; (3) federal precedent; (4) decisions of sister state courts; (5) the history of our constitution; and (6) sociological and economic considerations.

Nothing in the history or text of our constitution supports the defendant's claim. It is also plain that federal decisions do not support his position. An argument similar to the defendant's was rejected by the court in *Schad* v. *Arizona*, 501 U.S. 624, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991), which contains strong and convincing arguments against reaching any other result under our constitution. In *Schad*, the United States Supreme Court deferred to the states' determination that certain statutory alternatives are mere means of committing a single offense. This court has repeatedly so held concerning principal and accessorial liability. *State* v. *Flanders*, 214 Conn. 493, 504, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990); *State* v. *Smith*, 212 Conn. 593, 605, 563 A.2d 671 (1989); *State* v. *Baker*, 195 Conn. 598, 608, 489 A.2d 1041 (1985); *State* v. *Kemp*, 199 Conn. 473, 480 n.4, 507 A.2d 1387 (1986).

While giving initial deference to legislative competency in defining the elements of a crime, the court in *Schad* also recognized that fundamental fairness, as taught by "history and wide practice," as well as "the moral and practical equivalence" of the different elements required under a statute should be considered. *Schad* v. *Arizona*, supra, 501 U.S. 637. The Connecticut legislature has provided that "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he

were the principal offender." General Statutes § 53a-8 (a). The defendant has failed to present any historic or current indication that we as a people would regard this definition as not fundamentally fair and rational. Moreover, several sister states also recognize principal and accessorial liability as statutory alternatives. See *Dixon* v. *State*, 673 A.2d 1220, 1228 (Del. Super. 1996); *State* v. *Carothers*, 84 Wash. 2d 256, 525 P.2d 731 (1974); *Holland* v. *State*, 91 Wis. 2d 134, 280 N.W.2d 288 (1979), cert. denied, 445 U.S. 931, 100 S. Ct. 1320, 63 L. Ed. 2d 764 (1980).

With respect to the development of the law in other jurisdictions, the *Schad* court observed, in the words of the concurring opinion, that it has long been the general rule that when a single crime can be committed in various ways, a jury need not agree on the mode of commission. *Schad* v. *Arizona*, supra, 501 U.S. 651 (Scalia, J., concurring). Such historical and contemporary acceptance is further evidence that the defendant's conviction of capital felony does not offend some principle of justice so rooted in the tradition of our people as to be ranked as fundamental. Id., 643.

Finally, the *Schad* court considered whether the alternative means, as developed by the evidence, were morally equivalent. The record here shows that the jury found that the defendant either intentionally caused the death of the two victims or aided and abetted another in killing the two victims with the intent that they be killed. There was evidence that the motive and result of these murders was the robbery of one kilogram of cocaine and that both victims were shot in the head as they sat in their car with the cocaine. Under these circumstances, we conclude that there was evidence from which the jury could find a highly culpable mental state on the defendant's part under either means of committing murder. Such equivalence "is enough to rule out the argument that . . . moral disparity bars

treating them as alternative means to satisfy the . . . element[s] of a single offense." Id., 644.

We therefore reject the claim that the defendant has a right under the Connecticut constitution that the jury unanimously agrees on his liability as a principal or an accessory in his commission of a capital felony. Such a rule would lead to absurd results where, as here, the jury disagreed only about the defendant's exact role in the murders and there was ample evidence that he had intended the two victims to be killed. Our decision is, at its core, necessary and "indispensable in a system that requires a unanimous jury verdict to convict." Id., 651 (Scalia, J., concurring).

## IV

The defendant next claims that the state violated his rights to due process and a fair trial by eliciting testimony from the defendant's brother, Miguel Correa Motta, that the defendant did not discuss with his brother how he had obtained the block of cocaine, and by arguing in the presence of the jury that the defendant's statements to police that he found the cocaine in his car were inconsistent with the fact that the defendant did not give this explanation to his brother. The defendant made a motion for a mistrial, which the trial court denied. The court did, however, grant the defendant's motion to strike his brother's testimony and the state's argument. We conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

The state called Miguel Correa as a witness. On direct examination, Miguel Correa identified the defendant as his brother and testified that after the defendant was arrested, he visited the defendant in jail usually twice a month. Miguel Correa testified that when he asked the defendant "how his problem was going," the defendant responded that "they were accusing him of possession

of drugs at home." Miguel Correa further testified that the defendant never told him the source of the drugs that were found in the apartment that he shared with the defendant. When the state asked Miguel Correa whether he had strong feelings about illegal drug activity, the defendant objected to the relevance of the question. The state responded that the question was foundational, and the court allowed Miguel Correa to answer that he had strong feelings about drugs. Miguel Correa then testified that he hated drugs and that the defendant knew of these feelings.[18]

On the completion of this examination, and while the jury was present, the defendant moved to strike the testimony as irrelevant. The court asked the state to what the elicited testimony was supposed to be foundational. The state answered that the testimony was relevant because if the defendant was truthful in telling police that he found the drugs in his car, then he would have told his brother, who he knew hated illegal drugs, that he had come into possession of the drugs by innocent means and had no intention of selling them.

The next day, outside of the presence of the jury, argument continued regarding the defendant's motion to strike. The defendant also made a motion for a mistrial. He argued that a mistrial was required in view of the testimony before the jury. The court granted the defendant's motion to strike. The court denied the motion for a mistrial, however, stating: "I don't feel there is anywhere near sufficient prejudice, and especially with cautionary instructions that I'm going to give the jury that the defendant is—would be in any way prejudiced." The court then summarized Miguel Correa's testimony for the jury, including the inferences that the state argued could be drawn from the testimony, and instructed the jury "that [the] evidence that

---

[18] Miguel Correa also testified as to where he was employed.

you heard is not sufficient, at least at this time, for you to make any inference as to any conduct by the defendant during the course of . . . those conversations with his brother." The court instructed the jury, therefore, that the testimony was stricken from the record and that the jury was to disregard the testimony and any claims of inference that the state argued could be drawn from the testimony.

The defendant argues that the state improperly failed to bring the admissibility of the defendant's silence to the attention of the court prior to presenting it to the jury and failed to lay a basic foundation for the claim of admission. The defendant contends that this was in contravention of practice and the obligations of the state's attorney's office, and was exacerbated by the state's arguments before the jury. The defendant argues that the striking of this testimony and the rendering of a curative instruction were not sufficient to cure the prejudice caused by the state's attorney.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . *State* v. *Wooten*, [227 Conn. 677, 693–94, 631 A.2d 271 (1993)]. On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. *State* v. *Rodriguez*, 210 Conn. 315, 333, 554 A.2d 1080 (1989); *State* v. *Bausman*, 162 Conn. 308, 312, 294 A.2d 312 (1972)." (Internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 836–37, 661 A.2d 539 (1995). The trial court is in a better position than we are to evaluate

in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. Id., 837. The decision whether to grant a mistrial is within the sound discretion of the trial court. Id., 835; see Practice Book § 887.[19]

We are unpersuaded that the state's presentation of Miguel Correa's testimony and its comments concerning that testimony were so prejudicial, in the context of the whole trial, that the defendant was denied a fair trial. See *State* v. *Traficonda*, 223 Conn. 273, 282–83, 612 A.2d 45 (1992).

The defendant relies on *State* v. *Bryant*, 202 Conn. 676, 706, 523 A.2d 451 (1987), for the proposition that "[c]onsistent with a defendant's constitutional rights, the prosecution, in accord with the high standards of that office, must act in good faith" in its presentation of evidence. *Bryant* specifically concerned the prudence of holding a bench conference to ascertain whether a proper foundation existed for cross-examining an alibi witness about the witness' pretrial silence. Id., 705. We do not doubt that a bench conference, initiated by the state's attorney or the trial court, should have been held here.[20] *Bryant* did not foreclose, how-

[19] Practice Book § 887 provides in relevant part: "Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. . . ."

[20] While it is unclear on what specific basis the state sought to introduce Miguel Correa's testimony, the state, despite the defendant's arguments otherwise, was likely attempting to introduce evidence of the defendant's silence as an admission. "[S]tatements made within the accused's hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the *circumstances* show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him. *State* v. *Harris*, 182 Conn. 220, 228, 438 A.2d 38 (1980), quoting *State* v. *Ferrone*, 97 Conn. 258, 265–66, 116 A. 336 (1922). *State* v. *Morrill*, [197 Conn. 507, 535, 498 A.2d 76 (1985)]." (Emphasis added; internal quotation marks omitted.) *State* v. *John*,

ever, the use of a curative instruction in appropriate cases where a bench conference is not held prior to the hearing of the inadmissible evidence. Id., 706; see *State* v. *Traficonda,* supra, 223 Conn. 283 ("trial court promptly struck the witness' response, immediately admonished the jurors to 'erase it from your minds' and told them not to consider the statement in their deliberations").

Finally, the defendant argues that the state's attorney violated Practice Book § 288 by arguing, in the presence of the jury, the inferences that he claimed could be drawn from Miguel Correa's testimony. Section 288 provides in pertinent part: "Whenever an objection to the admission of evidence is made . . . [a]rgument upon such objection shall not be made by either party unless the court requests it and, if made, must be brief and to the point." As the defendant recognizes, the trial court asked the state to what Miguel Correa's testimony was supposed to be foundational. The state responded that the testimony created an inference that the defendant's statements to the police were untrue. The state did not, as the defendant contends, take the opportunity to take advantage of the court and the defendant, but was presenting its theory of relevancy.

While the state's presentation of Miguel Correa's testimony and its theory regarding the inference to be drawn therefrom was not based on sound evidentiary principles, it is not likely that the jury would be prejudiced by this portion of the proceedings. "Due process seeks to assure a defendant a fair trial, not a perfect one." *State* v. *Kurvin,* 186 Conn. 555, 565, 442 A.2d 1327 (1982). The trial court struck Miguel Correa's testimony

210 Conn. 652, 686, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989). The introduction of an admission by silence, therefore, requires a similar foundation as to that necessary for the cross-examination of an alibi witness regarding the witness' silence. *State* v. *Bryant,* supra, 202 Conn. 705.

immediately following the defendant's arguments on the issue and instructed the jury to disregard the testimony as well as the inferences that the state suggested could be drawn from the testimony. "It is to be presumed that the jury followed the court's instructions unless the contrary appears." *State* v. *Rouleou*, 204 Conn. 240, 254, 528 A.2d 343 (1987). Under the circumstances, we conclude that the trial court did not abuse its broad discretion by denying the defendant's motion for a mistrial.

## V

The defendant next claims that the trial court improperly admitted the expert testimony of Special Agent Richard Foster of the Federal Bureau of Investigation.[21] Foster testified concerning the cocaine distribution system in Hartford, cocaine purity levels, the value of cocaine in 1990, his opinion of Garcia's and Trujillo's role in the drug business and the nature of drug transactions, including the role of weapons in those transactions. The defendant argues that Foster impermissibly drew conclusions about the defendant's guilt by presenting the inferences that the state hoped the jury would reach from the evidence and that such testimony is not necessary from experts in this day and age. We find no merit to the defendant's claim.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. *State* v. *Campbell*, 225 Conn. 650, 654, 626 A.2d 287 (1993); *State* v. *Kemp*, [supra, 199 Conn. 476]; *State* v. *Palmer*, 196 Conn. 157, 166, 491 A.2d 1075 (1985); *Siladi* v. *McNamara*, 164 Conn. 510, 513, 325 A.2d 277 (1973); *Coffin* v. *Laskau*, 89 Conn. 325, 330,

---

[21] The defendant has not claimed that Foster was unqualified to testify as an expert witness.

94 A. 370 (1915)." *State* v. *Esposito*, 235 Conn. 802, 834, 670 A.2d 301 (1996). "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 431, 660 A.2d 337 (1995); *State* v. *Freeney*, 228 Conn. 582, 591, 637 A.2d 1088 (1994); *State* v. *Rodgers*, 207 Conn. 646, 651, 542 A.2d 1136 (1988); *State* v. *Kemp*, supra, 199 Conn. 476.

When the state offered Foster as a witness, the defendant objected to testimony concerning a Colombian or South American connection to cocaine that was being brought into Hartford through New York City. He claimed that evidence of such a connection was prejudicial and its prejudicial impact outweighed its probative value. The court agreed and restricted the evidence to portrayal of the roles of "mules," those people who transport the drugs, and middle-level, local dealers distributing the cocaine in Hartford since the evidence presented a reasonable basis for equating those roles with Garcia and Trujillo. During the lengthy colloquy that followed, the defendant conceded that evidence of the value of the cocaine, one kilogram of 54 percent purity, would be relevant on the issue of motive. The defendant persisted, however, in his claim that even this evidence would be prejudicial because it linked him to a worldwide drug problem in which cocaine came from South America. The court then restricted the testimony to evidence that cocaine comes from New York City to Hartford in order to avoid any connection of the defendant to an international drug cartel. Thereafter, Foster testified before the jury concerning the operation of a cocaine distributor, the value of the cocaine removed by the police from the defend-

ant's apartment, the significance of materials found at Garcia's apartment for cutting and distributing cocaine and the function of Trujillo in delivering cocaine to Garcia in Hartford.

The defendant argues that Foster's further testimony concerning the use of weapons, the potential for robbery and homicide during drug dealings, the interest of major drug dealers to retaliate for robberies with violence and the robbers' interest in, and means of, escaping retaliation should not have been allowed. He argues that the jury already knew of these circumstances and that expert testimony was not required, especially because the testimony was prejudicial.

We conclude that expert testimony concerning drug trafficking and its potential for violence may be admitted into evidence. *State* v. *Delossantos*, 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989) ("expert testimony that individuals possessing large amounts of drugs often carry weapons to protect their goods"). Even in this era when drugs and drug dealing have been widely portrayed in the media, the state may present evidence from those who have observed firsthand what is really happening on the streets. Here, the court was careful to instruct the jury that Foster's testimony should not be considered a judgment of the defendant's guilt, but only a view into a world that might be unknown to the average juror.

Furthermore, Foster's testimony concerning the use of weapons, the value of the kilogram of cocaine ($20,000 wholesale and $100,000 retail) and the use of murder to avoid retaliation was in every respect consistent with the evidence. There was evidence that the defendant arranged to buy one kilogram of cocaine for $20,000, that he went to make the deal armed with his nine millimeter pistol, that the dealers were shot at point blank range in the head while still in Garcia's car

and that the defendant then took the cocaine and left. In view of this, and the fact that Foster's testimony bore directly on the defendant's conduct, motive and role in the events, it was properly admitted. *Headley* v. *Tilghman*, 53 F.3d 472, 476 (2d Cir.), cert. denied, 516 U.S. 877, 116 S. Ct. 207, 133 L. Ed. 2d 140 (1995); see *United States* v. *Brown*, 776 F.2d 397, 401 (2d Cir. 1985), cert. denied, 475 U.S. 1141, 106 S. Ct. 1793, 90 L. Ed. 2d 339 (1986). Accordingly, we conclude that the trial court did not abuse its discretion in admitting Foster's expert testimony.

## VI

The defendant next claims that, in closing arguments, the state improperly appealed to ethnic prejudice and commented on the defendant's silence and failure to testify. The defendant did not preserve these claims at trial and now seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[22] We find no merit to the defendant's claims.

## A

Prosecutorial misconduct may occur in the course of closing arguments. *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987); *State* v. *Couture*, 194 Conn. 530, 563–64, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). "In order to deprive a defendant of his constitutional right to a fair trial, however, the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We

---

[22] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. . . . [M]oreover . . . [*Golding*] review of such a claim is unavailable where the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 769, 670 A.2d 276 (1996).

The defendant points to two isolated remarks by the state's attorney in the course of his closing arguments. In his opening summation, the state's attorney stated: "What this case is about is the dark and shadowy world of drugs, where greed leads to the buying and selling of the souls of men. A case about a Colombian who came to this country and who exploited the demand for drugs that exists here. Who became a merchant of despair and destruction." Then in rebuttal, the state's attorney stated: "Don't let [the defendant] laugh at the American system of criminal justice . . . . Just tell this man that in America, we do not tolerate the execution of people for the love of money."

The defendant argues that the state's attorney's remarks improperly appealed to prejudice against Colombians. The defendant contends that by stressing the defendant's ethnicity, the state's attorney invoked stereotypes of "violence, murder, drugs [and] lawlessness." Bermudez had testified before the jury that the defendant admitted to being from Colombia after the officer questioned him about Rio Pedras, Puerto Rico, from where the defendant initially claimed to have come. Also, there was evidence that, on the night of November 15, 1990, the defendant saw a newscast covering the murders and "had a small laugh." The state's

attorney alluded to that incident immediately prior to his reference to the defendant laughing at the justice system. Defense counsel did not object when the state's attorney's comments were made or at the end of the state's closing argument. He, therefore, "presumably did not regard [the] remarks as seriously prejudicial [when] they were made." *State* v. *Robinson*, 227 Conn. 711, 746, 631 A.2d 288 (1993); *State* v. *Negron*, 221 Conn. 315, 330, 603 A.2d 1138 (1992).

We likewise cannot conclude that, to the extent that the comments were inappropriate, they seriously prejudiced the defendant. The defendant fails to point to a sufficient pattern of misconduct to demonstrate blatantly egregious behavior. See *State* v. *Williams*, 231 Conn. 235, 245–47, 645 A.2d 999 (1994). The defendant cannot, by identifying isolated remarks, set forth a claim of constitutional magnitude. *State* v. *Chance*, 236 Conn. 31, 64, 671 A.2d 323 (1996); *State* v. *Atkinson*, supra, 235 Conn. 770; *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990); *State* v. *Smith*, 209 Conn. 423, 428, 551 A.2d 742 (1988). This claim is therefore not reviewable under *State* v. *Golding*, supra, 213 Conn. 239–40.

B

The defendant also argues that the state's attorney commented on the inability to cross-examine the defendant, who did not testify, regarding the defendant's statements to police. He claims that this was misconduct because it attracted the jury's attention to the defendant's decision not to testify.

"It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965). . . . This

court applies the following test in evaluating whether a prosecutor's remark has violated this right: ' "Was the language used manifestly intended to be, or was it of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" ' *State* v. *Walker*, 206 Conn. 300, 307, 537 A.2d 1021 (1988); *United States ex rel. Leak* v. *Follette*, 418 F.2d 1266, 1269 (2d Cir. 1969), cert. denied sub nom. *Leak* v. *Follette*, 397 U.S. 1050, 90 S. Ct. 1388, 25 L. Ed. 2d 665 (1970). Even an indirect remark by the prosecuting attorney may violate a defendant's privilege against self-incrimination if it draws the jury's attention to the failure of the accused to testify. *State* v. *Menzies*, 26 Conn. App. 674, 696, 603 A.2d 419, cert. denied, 221 Conn. 924, 608 A.2d 690 (1992) (*Berdon, J.*, dissenting from denial of certiorari)." *State* v. *Arline*, 223 Conn. 52, 66–67, 612 A.2d 755 (1992).

During his opening summation, the state's attorney reviewed the defendant's statements to Officer Laureano. He stated that after the defendant was read his *Miranda* rights, the defendant "tells some of the story. It's this incremental disclosure based on how much in trouble he thinks he is." The state's attorney then noted that although the defendant told Laureano that he wanted to reveal everything that he knew about the murders, he did not tell Laureano about being at Delgado's house, that he just bought the car, that he had been in a fight or that he had found drugs in his car.[23]

In rebuttal, the state's attorney argued that in the defendant's closing argument, "defense counsel [relied] on things the defendant said in his statement to the police, a statement that we can't cross-examine, but . . . in that statement, the defendant says he found the box in his car." We conclude that the state's attorney

---

[23] The defendant later related this information to Detective St. Pierre.

was not commenting on the defendant's refusal to testify, but rather, on the weight to be afforded the defendant's statements to the police.[24] See *State* v. *Negron,* supra, 221 Conn. 325 (challenged remark a comment on defendant's statements to three others); *State* v. *Magnotti,* 198 Conn. 209, 220, 502 A.2d 404 (1985) (comment on "overall quality of the defendant's evidence"). We find no merit to the defendant's claim.

## VII

Finally, the defendant requests that we inspect the exhibits sealed by the trial court to determine whether the contents were exculpatory and should have been disclosed. The record reveals that the defendant filed a pretrial motion for the disclosure of exculpatory evidence. During trial, the court reviewed numerous documents turned over by the state and, after determining that the state was not required to disclose the information in the documents, sealed them. We are unpersuaded by the defendant that he was prejudiced by that nondisclosure.

The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland,* 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms,* 201 Conn. 395, 405 and n.8, 518 A.2d 35 (1986). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the

---

[24] We note that it is well established that the principle of *Doyle* v. *Ohio,* 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), that the use of a defendant's silence after receiving *Miranda* rights may not be used to impeach the defendant at trial, is not violated in situations such as this where the defendant has chosen not to remain silent. See *State* v. *Joly,* 219 Conn. 234, 256–57, 593 A.2d 96 (1991); *State* v. *Lytell,* 206 Conn. 657, 661–62, 539 A.2d 133 (1988); *State* v. *Casey,* 201 Conn. 174, 185, 513 A.2d 1183 (1986); *State* v. *Talton,* 197 Conn. 280, 295, 497 A.2d 35 (1985).

defense; and (3) that the evidence was material. *Moore* v. *Illinois*, 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972)." *State* v. *Simms*, supra, 405; *State* v. *Shannon*, 212 Conn. 387, 398, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989).

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *State* v. *Shannon*, supra, 212 Conn. 399; *State* v. *Pollitt*, 205 Conn. 132, 148–49, 531 A.2d 125 (1987). "The determination of materiality has been said to be 'inevitably fact-bound' and like other factual issues is committed to the trial court in the first instance." *State* v. *Pollitt*, supra, 147. We have reviewed the sealed exhibits and the record, in the manner presented, and conclude that the defendant was not prejudiced. These documents provide no basis for the reversal of the defendant's conviction. *State* v. *Rasmussen*, 225 Conn. 55, 92, 621 A.2d 728 (1993).

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and NORCOTT and PETERS, Js., concurred.

BERDON, J., dissenting. The defendant's state and federal constitutional rights to due process and a fair trial were violated when the trial court improperly instructed the jury that it could find the defendant guilty of capital felony and robbery, either as a principal or as an accessory, after the jury had already commenced its deliberations, and when accessorial liability was neither alleged in the substitute information on those counts nor supported by the evidence. The egre-

giousness of the failure to furnish the defendant with notice that he was being charged with accessorial liability is underscored by the jury's vote in this case. Upon the trial court's polling of the jury,[1] the foreperson disclosed that ten members of the jury had voted to find the defendant guilty of capital felony and robbery as a principal, and two members had voted to find him guilty as an accessory.[2] In other words, two jurors voted to acquit the defendant of the charges of capital felony and robbery as a principal.

In *State* v. *Steve*, 208 Conn. 38, 544 A.2d 1179 (1988), the majority of the court reversed a conviction because of the state's failure to put the defendant on notice that he was being prosecuted as an accessory as well as a principal. In *Steve*, the court held as follows: "We conclude that . . . the defendant was prejudiced in his defense as a result of a substantial variance between the allegations in the bill of particulars and the court's instructions concerning accessorial liability. It is clear that the presentation of his defense relied upon the state's claim [in its bill of particulars] that the defendant was in fact the principal of each crime. . . . It is significant that the state presented no evidence in its case-in-chief suggesting that the defendant had acted as an accomplice. . . . The state did not seek to amend its information to allege that the defendant had acted as an accomplice . . . . We do not regard the state's notification to the defendant prior to [closing] argument of its intention to request a charge on accessorial liability as equivalent to an amendment offered seasonably before the close of evidence. . . . Accordingly, we need not decide whether such an amendment would have

---

[1] The defendant was also charged with and found guilty of two counts of murder. The jury was not polled on the murder counts because murder is a lesser included offense of the crime of capital felony.

[2] The defendant also raises the issue of whether such a nonunanimous jury verdict passes state constitutional muster. I leave that issue for another day.

been proper in these circumstances. We conclude that the court's instructions concerning accessorial liability were not in substantial conformity with either the allegations in the bill of particulars or the evidence in the state's case-in-chief, and, therefore, hold that these instructions were erroneous." (Citations omitted; internal quotation marks omitted.) Id., 45–46.

In an attempt to distinguish this case from *Steve*, the majority claims that the defendant was put on notice of accessorial liability, based upon the conspiracy counts from the "substitute information and bill of particulars" (substitute information) that the majority has applied completely out of context—that is, the majority points to clauses that allege that the defendant "agreed with another person, who is believed to use the street name, 'Yo-Yo,' to intentionally cause the death of [the victims] . . . ." First, this is not language of accessorial liability, but, rather, it is that of a conspiracy. This is made absolutely clear by the fact that the substitute information does not refer to the accessorial liability statute, General Statutes § 53a-8,[3] but, instead, it refers to the conspiracy statute, General Statutes § 53a-48.[4] For instance, the first count of the substitute information provides in pertinent part: "State's Attorney . . . accuses Jesus Alberto Correa . . . of the crime of conspiracy to commit capital felony, in violation of Connecticut General Statutes Sections 53a-48 [conspiracy]

---

[3] General Statutes § 53a-8 provides in pertinent part: "Criminal liability for acts of another. (a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[4] General Statutes § 53a-48 provides in pertinent part: "Conspiracy. . . . (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

and 53a-54b (8) [capital felony], and charges that at an unknown place, on or around November 15, 1990, Correa agreed with another person, who is believed to use the street name, 'Yo-Yo,' to intentionally cause the death of two persons . . . and that Correa committed an overt act in furtherance of said conspiracy, that is, he obtained a handgun and went to Adelaide Street, Hartford, CT, on November 15, 1990, to commit said murders."[5] This did not furnish the defendant with notice that he was being prosecuted as an accessory when he was only charged as a principal.[6]

Furthermore, the substitute information was filed in response to the defendant's motion for a bill of particulars,[7] which sought, inter alia, "[t]he specific crime

[5] In addition, count two of the substitute information provides in pertinent part: "Said State's Attorney further accuses Jesus Alberto Correa of the crime of conspiracy to commit murder, in violation of Connecticut General Statutes Sections 53a-48 [conspiracy] and 53a-54a [murder], and charges that, at an unknown place, on or around November 15, 1990, Correa agreed with another person, who is believed to use the street name, 'Yo-Yo,' to intentionally cause the death of two persons . . . and that Correa committed an overt act in furtherance of said conspiracy, that is, he obtained a handgun and went to Adelaide Street, Hartford, CT, on November 15, 1990, to commit said murders."

Also, count eight provides: "Said State's Attorney further accuses Jesus Alberto Correa of the crime of conspiracy to commit robbery in the first degree, in violation of Connecticut General Statutes Sections 53a-133, 53a-134 (a) (1) (2), and 53a-48, and charges that, at an unknown place, on or around November 15, 1990, Correa agreed with another person, who is believed to use the street name, 'Yo-Yo,' to commit the crime of robbery in the first degree . . . and that Correa committed an overt act in furtherance of said conspiracy, that is, he obtained a handgun and went to Adelaide Street, Hartford, CT, on November 15, 1990, to commit said crime."

[6] The majority also relies on the fact that the felony murder charges in counts six and seven of the substitute information allege that the defendant, or another participant, caused the deaths of the two victims. The defendant does not raise the issue of notice of accessorial liability with respect to counts six and seven, but, rather, he argues that he was not given notice of his potential culpability as an accessory under the capital felony charge (count three), the murder charges (counts four and five), and the robbery in the first degree charge (count nine).

[7] "The purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare his

charged including the statutory number, subsection and language which the defendant is alleged to have violated [and] [t]he specific acts, language or behavior of the defendant alleged to constitute the crime charged." Based upon the state's response to the motion, which culminated in the filing of the substitute information, it is clear that the state did not charge him with accessorial liability in the capital felony, murder or robbery counts.

Finally, even the assistant state's attorney conceded at trial that the defendant was charged as a principal when he stated to the trial court that if the defense were to suggest, by way of evidence or argument to the jury, that the defendant was an accessory, then the state would seek an accessory instruction "even though he was charged as a principal in the information."[8]

The majority also attempts to distinguish *Steve* on the basis that in this case there was evidence on which the jury could have found that the defendant was an accessory. This is simply incorrect. In this case, there was no evidence, as the state conceded at trial, of accessorial liability on the part of the defendant.[9] The state

---

defense and to avoid prejudicial surprise. . . . A bill of particulars limits the state to proving that the defendant has committed the offense in substantially the manner described." (Citation omitted; internal quotation marks omitted.) *State* v. *Steve*, supra, 208 Conn. 44.

[8] See footnote 9 of this opinion.

[9] The majority relies on the vague testimony of an eyewitness in the state's case-in-chief that, after she heard gunshots, she saw someone, who did not look unlike the defendant, run from the victim's automobile carrying a box and enter the passenger side of the getaway vehicle. The majority states that this testimony demonstrates that the state attempted to prove that the defendant was either the principal or an accessary. This assertion, however, is inconsistent with the admission by the assistant state's attorney at trial and the theory on which the state tried its case.

After the state completed its case-in-chief, the assistant state's attorney started to mention the possible issue of accessorial liability, and the trial court quickly responded by asking him, "[d]o we have some evidence here of accessorial liability?" The assistant state's attorney responded: "I don't think so but . . . there's a possibility that defense counsel could either

did not offer evidence that any person other than the defendant played an active role in the shooting. The only evidence introduced pointed to the defendant as principal. Indeed, even if we assume that there was evidence of accessorial liability, this case is more compelling than *Steve* for several reasons.

In *Steve*, the prosecution requested an accessorial charge prior to closing arguments. In this case, *only after the jury* sent a note to the trial court, raising the question of accessorial liability, did the court instruct the jury on this issue. Notwithstanding the majority's intimation to the contrary, the record clearly indicates that the instruction on accessorial liability was given after the jury began its deliberations, and *the state concedes this in its brief.* The trial court completed its charge to the jury at 12:48 p.m. and suggested that the jury go to lunch. Specifically, the trial court stated that: "Your first duty when you go into the jury room will be to select a foreperson from among you and then, after all of the exhibits are delivered to you, you may start your deliberations. . . . I'm going to excuse you now. My suggestion to you is, in view of the lateness—if you wish to select your foreman before you go to lunch,

argue to the jury or perhaps attempt to present evidence that . . . the defendant was the driver and not the assailant or whatever. And if that's the case, we certainly want the record to be clear that if such an argument or suggestion is going to be made to the jury, we would rely on the statute that allows Your Honor to charge [him as an] accessory even though he was charged as a principal in the information." There is not even a suggestion by the assistant state's attorney that the defendant presented evidence or raised the issue of accessorial liability.

The state, in its closing argument, argued to the jury that the defendant was the shooter/robber and reminded the jury "that you do not need to know the identity of any accomplice or any coconspirator in order to find the defendant guilty of the crimes charged that involve an accomplice or coconspirator." Indeed, the state presented testimony that the defendant, shortly after the time that the shootings occurred, arrived at his girlfriend's apartment carrying a box, with blood on his pants. The state also offered forensic evidence and testimony that the shirt worn by the defendant at that time contained residue from gunshots fired at close range.

you can do that. If not, you've certainly been sitting here long enough that you deserve to go to lunch but when you come back, you will go to the deliberation room. . . . You may not discuss this case unless all of you are together—all twelve of you are together in the deliberation room."

Because the judge had a commitment and would not return until between 3 and 3:30 p.m., and after having been instructed in the aforementioned manner, it is clear that the jury began deliberating before 3:57 p.m., the time at which they were brought back into the courtroom. This conclusion, which the majority does not directly contradict, is based on several facts. First, defense counsel expressed concern because the trial court would not entertain his exceptions to the charge until the judge returned after 3 p.m., and after the jury began its deliberations.[10] Second, defense counsel, when taking his exception to the supplemental instruction on accessorial liability the next day, referred to the fact that the jury had been deliberating for approximately one and one-half hours. Third, it is common sense to conclude that the jury commenced its deliberations prior to the charge on accessorial liability due to the fact that the jury crafted two questions for the trial

---

[10] The following colloquy occurred after the judge excused the jury and advised counsel that he would not return until approximately between 3 and 3:30 p.m.:

"Mr. Gold [Defense Counsel]: . . . My concern is that the jury will be deliberating for a period of time and we have a number of exceptions to be made and I don't want to waive—I'm prepared to do it—

"The Court: You are not waiving anything. All right? If the jury comes back before you get your exceptions in, I guess we're stuck with that and I don't expect that to happen.

"Mr. Massameno [Assistant State's Attorney]: Well, I don't expect it either but I presume that Your Honor would consider any exceptions to the charge before receiving a verdict.

"The Court: Absolutely. But I mean, if they say they've come to a verdict and I haven't done it yet, I suppose we'll have to face that at the time but we'll face that."

court, one of which prompted the giving of the accessorial liability charge.[11]

The conclusion that the jury began deliberating before the trial court instructed it on accessorial liability is buttressed by several other revealing facts contained in the transcripts. Before the jury returned to the courtroom at 3:57 p.m., the trial court had a short colloquy with the attorneys regarding the jury questions it had been presented with by the sheriff. After the questions were read into the record, the trial court stated that "if they want to keep deliberating, I don't have any problem. We'll just tell them that we can't give them an answer right now." The assistant state's attorney indicated that he did not want the jury to continue deliberating without the jury's questions first being answered by the court. After the jury returned to the courtroom, the trial court excused the jurors for the day and indicated that the court would answer their questions in the morning. In doing so, it was clearly indicated by the jury that it had been deliberating.[12] The next morn-

---

[11] The first question from the jury, written by the foreperson of the jury at 2:20 p.m., asking whether it could begin deliberating, was obviously moot by the time the jury was brought back into the courtroom at 3:57 p.m. The second question from the jury, written by the foreperson at 3:25 p.m., was with respect to whether it could consider accessorial liability on certain charges.

[12] After the jury returned to the courtroom, one juror asked the court whether the jury would be allowed to continue deliberating without having its questions answered. The following colloquy occurred:

"The Court: [S]omebody have a question? Is there a problem at coming in at 10 o'clock?

"Juror: No, I was just—we shouldn't continue if we—I mean, if we feel that we want to continue without having those questions . . . .

"The Court: Without the questions being answered at this time? Do you want to?

"Juror: I don't know. We have to discuss it but is that an option?

"The Court: Well, if you'd like to. If you'd like to but I don't—you know, I'd just as soon you not—I'd like to answer your questions first. I think perhaps you might be going down the wrong road if I don't answer them first. So, do you agree with that? Okay. . . . So then I'll excuse you at this time . . . ."

ing, the trial court gave supplemental instructions to the jury on certain issues and added the improper instructions on accessorial liability.

Unlike in *Steve*, we know that the jury's verdict was not unanimous in the present case. See *State* v. *Steve*, supra, 208 Conn. 47 (jury not polled, but concluding that trial court's improper instruction on accessorial liability "more likely than not affected the result"). Here, the trial court polled the jury and exposed the fact that ten jurors had found the defendant guilty as a principal on the capital felony and robbery in the first degree counts, and two jurors had found him guilty as an accessory on those counts.

Finally, the defendant was misled by the state because the state advised the trial court and defense counsel, after the presentation of its case-in-chief, that it would not seek a charge on accessorial liability unless the defendant suggested, by way of evidence or argument to the jury, that he was was not a principal, but an accessory.[13] The defendant relied on this representation when he presented his defense. It was only after the jury sought a clarification as to whether it could find the defendant guilty as an accessory on certain counts did the trial court broaden the defendant's potential culpability by instructing the jury that it could find him guilty as an accessory on those counts on which he had been charged only as a principal.

I find that not only is this case on all fours with *Steve*, but it presents additional facts, all of which are undisputed, that make it more compelling. In my view, the accessorial liability instruction deprived the defendant of a fair trial and due process of law. See *State* v. *Franko*, 199 Conn. 481, 491–92, 508 A.2d 22 (1986) ("[d]ue process requires that a criminal defendant be

---

[13] See footnote 9 of this opinion.

given notice of the specific charge against him and an opportunity to defend against that charge").

Accordingly, I dissent.

